Filed 3/5/13  In re Sebastian M. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re SEBASTIAN M., a Person Coming Under the Juvenile Court Law. | B240157<br>(Los Angeles County<br>Super. Ct. No. CK91302) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>CHRISTOPHER M.,<br><br>     Defendant and Appellant. | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed herein on February 20, 2013, be modified as follows:

On page 17, the first sentence in the second full paragraph, reads "The juvenile court also did not err in ordering father into a drug counseling program" is deleted and the following sentence is inserted in its place:

The juvenile court also did not err in ordering father to submit to "'[r]andom or on demand consecutive 8 drug tests,' and, 'if any test is missed or dirty, then full drug rehab program w/random testing.'"

There is no change in the judgment.

Appellant's Petition for Rehearing is denied.

Filed 2/20/13  In re Sebastian M. CA2/2 (unmodifed version)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re SEBASTIAN M., a Person Coming Under the Juvenile Court Law. | B240157 (Los Angeles County Super. Ct. No. CK91302) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CHRISTOPHER M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Rudolph A. Diaz, Judge.  Affirmed.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Emery El Habiby, Deputy County Counsel, for Plaintiff and Respondent.

_____

Christopher M. (father) appeals from a juvenile court dispositional order (Welf. & Inst. Code, § 395)[1] regarding his four-year-old son, Sebastian M. (Sebastian, born Dec. 2007). He contends that the juvenile court abused its discretion when it ordered father to participate in a 52-week parenting program and eight consecutive, random drug tests.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition and Detention*

Father and E. J. (mother) are Sebastian's parents.

This family came to the attention of the Department of Children and Family Services (DCFS) on November 25, 2011. DCFS's detention report indicates that DCFS received a referral, alleging that mother and her boyfriend, Luis Ruben L. (Ruben), engaged in domestic violence and that Ruben had slapped Sebastian with an open hand.

Emergency response worker Raquel Valenzuela (Valenzuela) interviewed Sebastian, who denied witnessing domestic violence between mother and Ruben. He said that he liked Ruben, who only "'tickle[d]'" him. When Valenzuela explained that tickling was not hitting, Sebastian responded, "'well my dad said to say that.'" Sebastian informed the social worker that Ruben does not hit him, but that two days earlier, father told him to say that Ruben does hit him. Also, father once told Sebastian "'to get a fork and stab Ruben on his chest while he is sleeping.'" Sebastian clarified that he would not do that.

Mother denied the allegations, stating that father had made false reports to DCFS in the past. Mother claimed that in 2008, father had bit her on the shoulder. She also asserted that father had been stalking her and insulting her in front of Sebastian since their relationship ended in 2010. Father had been arrested on April 23, 2011, for threatening to kill mother and Ruben and for hitting Ruben with a cane.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Previously custody orders issued in family court in May 2011. The family court had denied mother's request for a restraining order against father, but ordered the parents to exchange custody of Sebastian in the lobby of a police station and to conduct all nonemergency communication through the "Our Family Wizard" Web site. Subsequently, a criminal protective order issued under Penal Code section 136.2.

Mother claimed that during the custody exchanges, police officers observed father insulting her in front of Sebastian. The officers warned and counseled father and, on one occasion, asked him to leave first. Mother also claimed that father followed a social worker home and insulted her.

Father stated that DCFS was not protecting his child, who was being exposed to domestic violence and being hit by Ruben. Reportedly, when the social worker explained that there was no evidence of physical or emotional abuse to the child, father insulted the social worker, stating that she was biased in favor of mother because they are both Hispanic.

Valenzuela interviewed Sebastian in his room with father's permission. When asked about Ruben, Sebastian became very quiet and checked the door to make sure that it was locked. He also put his head in a pillow and did not want to talk. Sebastian denied being hit by father or Ruben. He told father that Ruben tickles him, but father told him to say that Ruben hits him. Sebastian stated that father asks him a lot of questions about mother and Ruben, and "'he says that I have to tell him everything or else he will get mad at me.'" When asked what happens if he does not tell his father, Sebastian responded, "'but I do and then he is happy.'" Later, Sebastian became quiet and sad and began to cry, saying "'I'm not going to see my puppy, I want to go to my mom's house to see my puppy.'"

Ruben denied engaging in domestic violence with mother or hitting Sebastian. He explained that a judge had denied mother's request for a restraining order due to lack of evidence that father was stalking, harassing, and insulting her.

3

Sebastian's family law attorney opined that father was using the family law court and Sebastian to "'get to mother'" and suspected that father was probably coaching Sebastian.

On December 13, 2011, father tested positive for hydrocodone, which he explained he was taking for a spinal injury. He did not provide proof that he had a prescription, and the social worker became concerned that father may have unresolved mental health or substance abuse issues.

That same day, Sebastian told the social worker that he and father passed by mother's address and began to follow Ruben by car. According to Sebastian, father also looks at mother's Facebook page, and points to her and calls her a bitch. Sebastian indicated that he was not afraid of father.

Officer Martinez said that father had behavioral issues during custody exchanges at the Sheriff's station, including continuing to try to speak to mother after she refused to speak to him. On one occasion, mother was advised to leave the station first and father was counseled to speak to mother through the "Family Wizard." On another occasion, father was physically removed from the police station.

Mother reported that during a recent custody exchange, father insulted her outside of the police station, stated that he knew her address, and yelled the address to her in front of Sebastian. Sebastian said that father went to mother's address and told him to point out mother's apartment.

Mother also claimed that father recently waited for her outside the police station in his car after they completed a custody exchange. Officers also witnessed father at the police station waiting for mother to leave. Detective White stated that father seemed agitated and demanding, and stated that mother needed to speak to him in person. Detective White advised him to communicate with her through the "Family Wizard."

Detective White also informed the social worker that a criminal hearing was set for January 23, 2012, regarding the April 23, 2011, charges against father for assault with a deadly weapon and criminal threats to mother and Ruben. The police also had been called to mother's old address several times because father allegedly violated orders,

wrote lewd letters to mother, and threatened Ruben.  The police counseled father and released him.

On January 4, 2012, DCFS filed a section 300 petition on behalf of Sebastian. Counts a-1 and b-1 alleged that father bit mother's shoulder, threatened to kill mother, stalked mother with Sebastian in the car, and called mother derogatory names in Sebastian's presence.  Counts a-2 and b-2 alleged, in part, that father struck mother's male companion with a wooden cane and his fists and threatened to kill him.  At the detention hearing, the juvenile court detained Sebastian from father and released him to mother.  Father was allowed monitored visits three times a week, two hours per visit.

*Restraining Orders*

Valenzuela and supervising social worker Raquel Rivas (Rivas) filed applications for restraining orders protecting them from father.  They claimed that father had followed them out of the building after hours.  Valenzuela had received several consecutive "missed" telephone calls from an unknown number, and, during one call, heard someone breathing into the phone.  Reportedly, father disclosed that he had taped Valenzuela and Rivas leaving the building.  One day later, father called Valenzuela requesting a visit with Sebastian, and became loud and upset that he could not visit that day.  He told Valenzuela that he could "'Google'" her name just like he "'go[o]gled'" mother and found her.  On January 24, 2012, the juvenile court issued mutual stay away orders for father and the social workers.

*Jurisdiction/Disposition Report*

DCFS advised that Sebastian had told Dependency Investigator Luis Cardenas (Cardenas) that father only called mother a bitch once or twice.  When asked if he saw his parents fighting, Sebastian replied:  "'My mommy and dad don't fight.'"  He also denied that father told him to hurt Ruben.  Cardenas could not verify Sebastian's statements from prior interviews, given his refusal to answer Cardenas's questions.

Father claimed that Valenzuela's statements in the detention report were false, and she could not have interviewed Sebastian on the date stated because Sebastian was in father's custody that weekend.  Father also said that the allegations against him were

5

false. He bit mother in a sexual context during their relationship. He denied all of the other assault allegations and denied ever threatening mother. He also denied calling mother derogatory names, arguing with her in front of Sebastian, stalking mother, following mother, or questioning Sebastian about her. Father prepared a list of his issues and concerns regarding mother for the social worker, including that mother exposed Sebastian to domestic violence and verbal abuse between herself and Ruben and allowed Sebastian to interact with a sex offender who lived next door.

Father explained that on April 23, 2011, he informed mother that he would be coming by to pick up Sebastian's bicycle. He left Sebastian in the paternal grandmother's care while he went to collect the bicycle. When father arrived at mother's home, Ruben and his friends attacked him. Father defended himself, but was arrested. The charges against him were being dropped because father asserted that he acted in self-defense.

Mother claimed that father arrived at her birthday party that day, uninvited and unannounced. Ruben claimed that father had threatened to kill him. Father also insulted mother's aunt and the aunt's husband. Ruben and his friend intervened when it appeared that father was going to hit the aunt with a cane. Father then hit Ruben in the face with the cane, and the two men began fighting. Several guests restrained father until the police arrived and arrested him.

Both Ruben and mother claimed that on March 1, 2011, father went to mother's home as she opened the door for Ruben and grabbed mother's neck. When mother and Ruben stated that they were calling the police, father took mother's cell phone and left. Subsequently, father allegedly called Ruben on a daily basis, threatening to kill him.

Detective White stated that a criminal case has been filed by the city attorney against father and remained ongoing. It was very likely that the case regarding the March 1, 2011, incident would be heard with the case regarding the April 23, 2011, incident. However, during the custody exchanges, father listened when Detective White counseled him not to speak to mother.

6

DCFS recommended that the juvenile court dismiss the section 300 petition without prejudice, concluding that, while father appeared to be harassing mother, there was no clear indication that he purposefully intended to cause Sebastian any detriment. There was no sufficient evidence indicating that father had neglected or abused Sebastian. No concerns were noted regarding father's monitored visits with Sebastian, who interacted well with father. Sebastian never witnessed father physically assaulting mother or Ruben, and Sebastian showed no signs of emotional abuse. Mother appropriately reported father to law enforcement when she believed that he had committed a crime against her. DCFS recommended that the juvenile court terminate dependency jurisdiction with a new family law order awarding the parents joint legal and physical custody of Sebastian and ordering Sebastian to attend counseling.

*Last Minute Information and Hearing (Feb. 1, 2012)*

On February 1, 2012, while waiting in the courthouse lobby for the case to be called, mother told social worker Jose Sartorio (Sartorio) that father had threatened her. Father denied threatening mother and complained that DCFS was permitting his child to live with a woman with a sixth grade education. He requested that the social worker tell mother to meet him in the cafeteria.

Cardenas reported that DCFS recommended that the section 300 petition not be dismissed, opining that father had "an anger management issue and a clear lack of control" that seemed likely to expose the child "to emotionally harmful confrontations between his parents instigated by the father." Although Sebastian did not disclose to Cardenas that his father instructed him to stab Ruben in the chest, Valenzuela reported that the child was very serious and credible when he made these statements in the detention report.

At the February 1, 2012, hearing, father denied behaving aggressively as reported and objected to DCFS's request for a continuance to consider filing a first amended petition. The juvenile court continued the matter to February 16, 2012, and ordered DCFS to file a first amended petition by February 9, 2012.

*First Amended Petition*

On February 9, 2012, DCFS filed a first amended petition on behalf of Sebastian pursuant to section 300, subdivisions (a) and (b). The amended petition contained the same allegations as those in the original petition and added count b-3, alleging that father "demonstrated behavior consistent with emotional problems," by "engaging in uncontrollable, extremely aggressive and volatile behaviors towards others." Specifically, on March 1, 2011, the petition alleged that he "physically assaulted the mother and her boyfriend." And, on April 23, 2011, he allegedly "assaulted the mother's boyfriend and threatened to harm the mother, the mother's boyfriend and the mother's guests." Again on February 1, 2012, he called mother a "bitch" in the lobby of the Children's Court. The petition further alleged that father had not been able to control his behavior at the police station during custody exchanges; he pointed out mother to Sebastian and identified her as a "bitch"; he instructed Sebastian to point out mother's apartment; he directed Sebastian to stab Ruben with a fork while Ruben was asleep; and he directed Sebastian to falsely accuse Ruben of hitting the child.

*Interim Review Report*

On February 16, 2012, DCFS reported that, during a new interview, Sebastian indicated that father calls mother a bitch all the time. During the previous interview, Sebastian stated that father only called mother a bitch once or twice. Sebastian also disclosed that Ruben had punched him in the chest while they were doing a somersault and playing. When asked who told him to say that, Sebastian appeared puzzled. No bruises were observed on Sebastian's chest. Sebastian responded affirmatively when asked if someone told him to stab Ruben with a fork, but he did not identify the individual.

Father denied mother's allegations that he called her derogatory names and threatened her in the courthouse on February 1, 2012. He also denied instructing Sebastian to point out mother's apartment, telling Sebastian to stab Ruben with a fork, telling Sebastian to say that Ruben had hit him, and insulting mother at the police station. He believed that mother was coaching Sebastian because he heard his son say that

8

someone told him to say that father touches him all over his body. Mother claimed that father had recently called her, but father explained that he accidentally dialed mother's telephone number.

Father presented Cardenas with the family court docket, which indicated that the family court had denied mother a restraining order because she failed to prove her allegations against him. That said, father had not obeyed the family court order that he not go to mother's residence when he went to her home on April 23, 2011. Mother presented Cardenas with the criminal protective order filed on June 21, 2011.

Valenzuela stated that she felt threatened and scared of father because he "would constantly call her pressuring her and on several occasions called her ignorant and accused her of not doing her job." When "she would try to deescalate him . . . he would laugh at her." He waited for her and her supervisor in the lobby for six hours and videotaped them leaving the building. He also told her that he could "[G]oogle" her and find her. Valenzuela also claimed that when she interviewed Sebastian at father's home, Sebastian appeared "very aware that his father may be listening" and "appeared nervous and got up to check if the door was closed."

Mother's acquaintance, Lidia C. (Lidia), who is a social worker, helped mother prepare paperwork for her family law case and served father a notice of hearing, which contained Lidia's contact information. Lidia claimed that father had called her and insulted her, and also went to her home and told her husband that he wanted Lidia to stay out of his family's problems.

A deputy city attorney stated that his office was not dismissing the criminal case (charging criminal threats, spousal battery, petty theft, simple battery, and trespassing) against father.

DCFS recommended that the juvenile court sustain the first amended petition, offer mother family maintenance services, and offer father reunification services. No written case plan was attached to the report.

9

*Last Minute Information*

In a subsequent report, father reportedly asked Sebastian questions about mother and Ruben during a recent monitored visit. Sebastian appeared anxious and stated several times that he wanted to go with mother. Sebastian also indicated that he wanted his father to come to the visits after being asked several times. Father expressed dissatisfaction with having to go to DCFS to visit his child. He also expressed that Ruben continued hitting Sebastian, but DCFS failed to do anything about it. At the end of the visit, when Sebastian said that he was thirsty, father reportedly told Sebastian that his mother would give him something to drink because she had money and was "'a better parent.'"

After the visit, social worker Sartorio received an e-mail from the Child Protection Hotline, stating that father reported that the social worker had told him to contact the hotline to report his concerns. The social worker claimed that he did not tell father to call the Child Protection Hotline.

*Combined Jurisdiction/Disposition Hearing*

<u>Father's Testimony</u>

At the March 12, 2012, combined jurisdiction/disposition hearing, father testified first. He stated that he believed he was in dependency court because mother was unhappy with the visitation orders she had obtained in family court. He denied acting inappropriately at custody exchanges at the police station, noting that no reports existed establishing that he had done so. He believed that mother and Lidia coached Sebastian to say that father says bad words to mother.

During visits, father reads and writes with Sebastian. He denied talking about mother during his last visit with Sebastian, explaining that if he had done so, the visit would have been terminated.

Father further denied all of the allegations and damaging statements made against him, although he indicated that he may have struck Ruben in the face with his fists. He also questioned the reason Hispanic social workers were assigned to the case, given

10

mother speaks fluent English and he does not speak Spanish. He denied stating that Hispanic people were ignorant.

Father remained unemployed since about 2007. He had two spine-related surgeries within the last six months and had to take pain relievers and anti-inflammatory medication, which he stopped taking since the procedures. He took hydrocodone intermittently for flare ups of the injury at the base of his spine, explaining: "the CI was crushed in five different places." He never noticed any changes in his behavior associated with taking hydrocodone or the any other medications prescribed postsurgery. He provided his doctor's name and contact information.

The parents began making custody arrangements in 2011. Neither mother nor Ruben ever expressed any concern that father hit Sebastian. Sebastian was not present when father allegedly called mother a bitch outside the courtroom. During the April 23, 2011, incident, Sebastian was in the paternal grandmother's care. Father had never seen a psychiatrist and none of his doctors recommended that he do so.

Father stated that the district attorney's office had rejected a criminal case against him. The city attorney's office decided to prosecute the case after mother sought a restraining order against him. All of mother's requests for restraining orders against him had been denied. He and mother had a "keep the peace" order in place, not a criminal restraining order.

Finally, father testified regarding a recent incident at an El Pollo Loco. He said that he went to buy lunch for Sebastian to take to their visit as he always does. He saw Sebastian and mother there. He said "hi" to Sebastian and walked out. He took a picture of mother to establish that she had failed to attend therapy as ordered. He did not threaten mother.

Mother's Testimony

Mother testified next. She said that she never saw father physically abuse Sebastian. Sebastian had not been diagnosed with anxiety or depression, but sometimes he had difficulty going to sleep after visiting father.

Mother asserted that father had called her derogatory names in front of Sebastian, including at the police station. A week ago, Sebastian called her a bitch, stating that is what his father calls her. Over father's objection, mother testified that Sebastian stated that father told him to stab Ruben with a fork while Ruben was sleeping. Sebastian also stated that father told him to say that Ruben hit him, but Ruben never hit Sebastian.

Mother then testified that she unsuccessfully attempted to obtain a restraining order in family court; however, in June 2011, she obtained a criminal restraining order against father, which expires in three years. She felt threatened by father because she did not know if he would be there when she went out or what he is capable of doing. In March 2011, father entered her home when she opened the door for Ruben, grabbed her neck, and pushed her against Ruben and took her cell phone. Father had also followed her while he had Sebastian in the car and called her derogatory names and made a negative comment. She could hear Sebastian crying. Father also called her a week ago and began yelling at her, even though the court had ordered him not to contact or approach her.

Mother then told the juvenile court about the recent incident at El Pollo Loco. Father arrived there while mother and Sebastian were eating lunch. Father did not threaten them, but started taking pictures of them and was laughing. Sebastian responded by trying to explain the situation to himself, stating: "Why is my dad doing this?" and "Oh, maybe it's because he loves me."

<u>Valenzuela's Testimony</u>

Valenzuela testified that Sebastian cried and was emotional and guarded during her interview of him. However, she had interviewed other children who cried and were sad. When she asked Sebastian why he was crying, he replied: "I'm not going to see my puppy any more." Sebastian also checked the door to make sure it was closed while he was disclosing information about father. Father told Sebastian that "tickling is hitting," but Sebastian denied that Ruben hit him. She believed that Sebastian was at risk of physical harm because he stated that father told him to stab Ruben with a plastic fork.

But, Sebastian had indicated that father had not hit him, and he was not afraid that father would physically harm him.

She further opined that father was manipulative and demanding, and she was afraid of him because she felt she "needed to listen to him" when he told her to re-interview Sebastian. She was offended that he said that she was biased in mother's favor based upon her ethnicity. Father admitted that he repeatedly called her from an unknown number; he also breathed heavy into the phone. One time, he went to the DCFS office at 1:30 p.m. and was there at 5:30 p.m. when she left. The next day, he claimed to have videotaped her leaving the building. He also made a statement about finding out where she lived.

Cardenas's Testimony

Cardenas testified that he had worked for DCFS for three years, but only had worked as a dependency investigator for five months when he was assigned to this case. He made a mistake when he recommended dismissal of this case because he failed to give enough weight to Sebastian's initial statements to the emergency response worker. He reexamined everything when he learned of the event outside the courtroom.

He stated that father had behaved aggressively outside the courtroom on February 1, 2012, by calling mother a bitch. He admitted that he had not witnessed the incident and had never observed the parents interacting. He also believed that domestic violence was an issue because father insulted mother as he drove by with Sebastian in the car crying, and because he threatened mother at a party in Sebastian's absence.

When asked what made him think father would hit Sebastian, Cardenas replied: "I don't believe that the actual investigation involves . . . father physically abusing the child." At that point, the juvenile court dismissed the counts alleged under subdivision (a) of section 300.

Cardenas believed that father may begin hitting Sebastian because he "has a tendency to become enraged when people [do not] meet his expectations." While father never acted aggressively towards Sebastian during visitation, Cardenas believed that based on father's interactions with adults, he would direct the same anger towards

13

Sebastian. His belief was based on incidents at the police station where father repeatedly behaved aggressively towards mother, called her a derogatory name, and was escorted out. Also, a couple of weeks earlier, Sebastian called his mother a bitch.

Cardenas believed that father was not concerned about Sebastian because father questioned Sebastian about mother and Ruben during a recent visit.

Cardenas opined that father was dangerous because he could not control himself in the courtroom, the DCFS office, or a police station. He had also acted aggressively toward and insulted and threatened mother and her friends, including by going to Lidia's home, approaching her husband, and asking them to stay out of his business. Cardenas believed that father posed a threat to anyone trying to help mother. In fact, the first two social workers on the case were scared of father because he waited at the office for five hours and videotaped them.

Juvenile Court's Order

After entertaining oral argument, the juvenile court sustained counts b-1,[2] b-2,[3] and b-3[4] of the first amended petition.

---

[2]    Count b-1 alleges that mother and father "have a history of engaging in violent altercations. On a prior occasion, . . . father bit . . . mother's shoulder. On 4/23/2011, . . . father threatened to kill . . . mother. On a prior occasion in 2011, . . . father stalked . . . mother while the child was a passenger in the car and called . . . mother derogatory names in the presence of the child. On numerous prior occasions, . . . father stalked . . . mother. Such violent conduct on the part of . . . father against . . . mother[] endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of physical harm, damage and danger."

[3]    Count b-2 alleges that on April 23, 2011, mother's male companion and father "engaged in a violent altercation, in which . . . father repeatedly struck the male companion's body with a wooden cane and struck the male companion's face with [his] fists. On 4/23/2011 and on a prior occasion, . . . father threatened to kill the male companion. Such violent conduct on the part of . . . father against the male companion, endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of physical harm, damage and danger."

14

<u>Dispositional Phase</u>

During the dispositional phase of the proceedings, Cardenas testified regarding the recommended case plan, which included a 52-week domestic violence program, a 52-week parenting program, drug testing, individual counseling, and an anger management program. Cardenas also was not opposed to father undergoing an Evidence Code section 730 evaluation to determine what drives his behavior.

Father objected to the proposal that he undergo an Evidence Code section 730 evaluation and that he participate in a 52-week domestic violence program, a 52-week parenting program, and random drug testing.

The juvenile court then declared Sebastian a juvenile court dependent, removed him from father, and placed him with mother with family maintenance services. Father was ordered to participate in family reunification services, including a 52-week domestic violence program, a 52-week, probation-approved parenting program, anger management counseling, and individual counseling with a licensed therapist. He was also required to complete eight consecutive random drug tests and to submit to a psychiatric evaluation. Finally, father was granted monitored visitation.

---

**4** Count b-3 alleges that father "demonstrated behavior consistent with emotional problems as demonstrated on 03/01/2011, 04/23/2011, 02/01/2012 and on numerous prior occasions, by father engaging in uncontrollable, extremely aggressive and volatile behavior towards others. On 03/01/2011 . . . father physically assaulted . . . mother and her boyfriend. On 04/23/2011, . . . father assaulted . . . mother's boyfriend and threatened to harm . . . mother, [her] boyfriend and . . . mother's guests. On 02/01/2012, . . . father verbally assaulted . . . mother by calling her a 'bitch' in the waiting lobby of Children's Court despite the services Children Social Worker's attempts to redirect . . . father to stay away from . . . mother. On prior occasions . . . father has not been able to control his behavior while exchanging his child at the police station and has been asked to leave the police station and advised not to speak to . . . mother while conducting the exchange. On a prior occasion . . . father has pointed out . . . mother to the child and identified her as a bitch. On prior occasions . . . father has instructed the child to point out mother's apartment. On prior occasions . . . father has directed the child to stab . . . mother's boyfriend with a fork while [he] is sleeping, and to falsely accuse . . . mother's boyfriend of hitting him [the child]. Father's behavior places the child at substantial risk of physical and emotional harm and damage."

15

Father requested a bus pass and a parking pass, explaining that he had to drive 20 miles to visit Sebastian and it cost him $10 to park every time he visited (for a total of $30 per week). The juvenile court denied his requests, stating: "He doesn't need a transportation allowance. He's got his own car. He's not taking a bus, so he can do that."

*Appeal*

Father's timely appeal ensued.

## DISCUSSION

I. *Standard of review*

In reviewing a juvenile court's order regarding the requirements of a case plan, some appellate courts have applied the abuse of discretion standard and some have applied the substantial evidence standard. (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474*; In re Jasmin C.* (2003) 106 Cal.App.4th 177, 188.) The practical differences between these two standards are not significant. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling . . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [ it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . .'"'" (*Ibid.*)

II. *The juvenile court made a proper case plan*

Pursuant to section 362, the juvenile court has the discretion to fashion dispositional orders that are reasonable "for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a); see also *In re Corrine W.* (2009) 45 Cal.4th 522, 532.) Section 362, subdivision (d), provides: "The juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out the provisions of this section. . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d); see

16

also *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172.) This provision and others in the Welfare and Institutions Code "have been broadly interpreted to authorize a wide variety of remedial orders intended to protect the safety and well-being of dependent children." (*In re Carmen M.* (2006) 141 Cal.App.4th 478, 486.)

Father has a long history of harmful parenting of Sebastian. Although there is no evidence that he physically abused his son, ample evidence exists that father's hostile behavior towards mother took an emotional and psychological toll on Sebastian. Moreover, father involved Sebastian in his domestic violence with mother by telling him to stab Ruben while he slept. Father repeatedly disparaged mother in the child's presence and used the child to spy on mother. Father was also using information about Sebastian's therapy sessions to sabotage Sebastian's attempt to improve his mental health. Under these circumstances, the juvenile court did not err in ordering father to participate in a 52-week, as opposed to a shorter, parenting class.

The juvenile court also did not err in ordering father into a drug counseling program. Father admitting to using hydrocodone, but he never provided a prescription to the social worker. Based on father's erratic, hostile, and belligerent behavior throughout the pendency of this matter, the juvenile court could reasonably conclude that father may have been abusing drugs and thus properly ordered him into a drug counseling program.

Father's reliance upon *In re Sergio C.* (1999) 70 Cal.App.4th 957 is misplaced. In that case, "the *only* evidence of [the father's] alleged drug use [was the mother's] unsworn and unconfirmed allegation, which was flatly denied by [the father]." (*Id.* at p. 960.) Here, in contrast, father admitted to using hydrocodone. *In re Basilio T.*, *supra*, 4 Cal.App.4th 155 is also distinguishable. In that case, "[o]ther than the social worker's observation that [the mother] behaved somewhat out of the usual and was obsessed with discussing a fortune-making invention, there was nothing in the record to indicate either [mother] or [father] had a substance abuse problem." (*Id.* at p. 172.) Again, here, father admitted to using hydrocodone. Father's admission, coupled with his aggressive behavior, substantiates the juvenile court's order.

17

In urging us to reverse, father points out that DCFS failed to prepare a written case plan prior to the dispositional hearing as required by section 16501.1, subdivision (d). While that may be true, father has not shown how DCFS's failure amounts to reversible error by the juvenile court. As set forth above, ample evidence supports the juvenile court's order. Father has not demonstrated or explained how a written case plan would have yielded a different, more favorable case plan.

Finally, and almost in passing, father objects to the juvenile court's order denying him a transportation allowance and a parking pass for visitation at DCFS's office. Father did not, however, adequately brief this issue. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) As such, we treat it as waived.

**DISPOSITION**

The juvenile court's order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
                ASHMANN-GERST

We concur:

_____, P. J.
       BOREN

_____, J.
       CHAVEZ